[ORAL ARGUMENT SCHEDULED FOR NOVEMBER 4, 2014]

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

| | |
|---|---|
| Larry Klayman, *et al.*, | ) |
| | ) |
| | ) |
| Appellees-Cross-Appellants, | )  Case Nos.  14-5004, 14-5005, |
| | )    14-5016, 14-5017 |
| v. | ) |
| | ) |
| Barack Hussein Obama, *et al.*, | ) |
| | ) |
| Appellants-Cross-Appellees. | ) |
| | ) |

_____

**BRIEF OF AMICUS CURIAE CENTER FOR NATIONAL SECURITY STUDIES IN SUPPORT OF AFFIRMING THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION <u>ON ALTERNATIVE STATUTORY GROUNDS</u>**

PAUL M. SMITH
MICHAEL T. BORGIA
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
psmith@jenner.com
mborgia@jenner.com

August 20, 2014

Additional Counsel Listed on Inside Cover

MICHAEL DAVIDSON
3753 McKinley Street, NW
Washington, DC  20015
(202) 362-4885
mdavid2368@aol.com

*Of Counsel*

KATE A. MARTIN
CENTER FOR NATIONAL SECURITY
STUDIES
1730 Pennsylvania Ave., N.W., S. 700
Washington, D.C. 20006
(202) 721-5650 (telephone)
(202) 530- 0128 (fax)
kmartin@cnss.org


JOSEPH ONEK
THE RABEN GROUP
1640 Rhode Island Ave., N.W., S. 600
Washington, D.C. 20036
(202) 587-4942 (telephone)
(202) 463-4803 (fax)
jonek@rabengroup.com

*Counsel for Movant Center for
National Security Studies*

## CERTIFICATE OF AMICUS CURIAE AS TO <u>PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to Circuit Rules 27(a)(4) and 28(a)(1), the Center certifies that:

**A.     Parties and Amici.**  Plaintiffs-Appellees-Cross-Appellants are Larry Elliot Klayman, Charles Strange and Mary Ann Strange.

Plaintiffs-Appellees are Michael Ferrari and Matt Garrison.

Defendants-Appellees are Facebook, Mark Zuckerberg, Google, Inc. Larry Page, YouTube LLC, Salar Kamangar, Apple, Inc., Timothy Cook, Microsoft Corporation, Steve Ballmer, Skype, Tony Bates, America Online, Inc., Tim Armstrong, Marissa Meyer, Palalk, Jason Katz, AT&T, Inc., Randall L. Stephenson, Spring Communications Co. and Daniel Hessee.

Defendants-Appellants-Cross-Appellees are Barack Hussein Obama, Eric. H. Holder, Jr., Keith Alexander, Lowell C. McAdams, National Security Agency, United States Department of Justice, Roger Vinson and Verizon Communications Inc.

**B.     Ruling Under Review.**  Defendants-Appellants appeal the Order, with associated Memorandum Opinion, granting Plaintiffs' Motion for Preliminary Injunction as to plaintiffs Larry Klayman and Charles Strange, issued by the United States District Court for the District of Columbia, Judge Richard J. Leon., on December 16, 2013.  *See Klayman v. Obama*, No. 13-cv-00851, slip op.

i

(D.D.C. Dec. 16, 2013), ECF No. 49; *Klayman v. Obama*, No. 13-cv-00881, slip op. (D.D.C. Dec. 16, 2013), ECF No. 41. Plaintiffs-Appellees-Cross-Appellants appeal the same Order denying Plaintiffs' Motion for Preliminary Injunction as to plaintiff Mary Ann Strange. The associated Opinion is available at *Klayman v. Obama*, No. 13-cv-00851, slip op. (D.D.C. Dec. 16, 2013), ECF No. 48; *Klayman v. Obama*, No. 13-cv-00881, slip op. (D.D.C. Dec. 16, 2013), ECF No. 40.

**C.    Related Cases.** Plaintiffs filed two related actions in the district court, nos. 13-cv-00851 and 13-cv-00881. Presently before this Court are four appeals, representing the appeals and cross-appeals filed from those two district court actions: nos. 14-5004 (Defendants' appeal from 13-cv-00851), 14-5005 (Defendants' appeal from 13-cv-00881), 14-5016 (Plaintiffs' cross-appeal from 13-cv-00851) and 14-5017 (Plaintiffs' cross-appeal from 13-cv-00881). The four appeals have been consolidated by order of this Court.

/s/ Paul M. Smith
Paul M. Smith
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001

*Counsel for the Center for National Security Studies*

## DISCLOSURE STATEMENT OF AMICUS CURIAE
## PURSUANT TO CIRCUIT RULE 26.1

**A.**     The Center is a project of the National Security Archive Fund, Inc., a tax-exempt organization.  The Center does not have any parent companies.  No publicly held company owns 10% or more of the stock of the National Security Archive Fund, Inc., or of the Center.

B.     The Center is dedicated to the defense of civil liberties, human rights, and constitutional limits on government power.  A principal concern of the Center is the prevention of illegal government surveillance.  No members of the Center have issued shares or debt to the public.

/s/ Paul M. Smith
Paul M. Smith
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001

*Counsel for the Center for National Security Studies*

iii

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF AMICUS CURIAE AS TO PARTIES, RULINGS AND RELATED CASES.................................................................i

DISCLOSURE STATEMENT OF AMICUS CURIAE PURSUANT TO CIRCUIT RULE 26.1 ................................................... iii

TABLE OF AUTHORITIES ................................................vi

INTEREST OF AMICUS CURIAE ....................................................1

ARGUMENT ................................................................2

I.    INTRODUCTION ................................................................2

II.   SECTION 501 DOES NOT AUTHORIZE THE PROGRAM. ......................7

      A.    Section 501 is Explicitly Directed Just to the FBI. ..............9

      B.    Section 501 Only Allows for Collection of Tangible Things for Specific Investigations. ........................................11

      C.    Section 501 Requires that Collection be "Relevant" to Authorized Investigations. ..................................12

      D.    Section 501 is Limited to Tangible Things that Can Be Obtained by a Grand Jury Subpoena or Other Court Order...............19

      E.    Unlike other FISA sections, Section 501 Contains No Provision to Regulate Continuous Collections....................................20

III.  CONGRESS DID NOT RATIFY THE FISC'S PREVIOUS INTERPRETATION OF SECTION 501 WHEN IT EXTENDED THE SUNSET OF SECTION 501 IN 2011.........................................23

      A.    Applying the Doctrine Here Conflicts with Precedent and Is Both Factually and Legally Unfounded. .............................24

      B.    Secret Ratification is Inconsistent with Democratic Principles. .........30

CONCLUSION ................................................................32

CERTIFICATE OF COMPLIANCE..........................................................34

CERTIFICATE OF SERVICE ................................................................35

# TABLE OF AUTHORITIES\*

**CASES**

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936)........................2, 4

*Bilski v. Kappos*, 130 S. Ct. 3218 (2010) ...............................................................11

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986).....................................................................................................................4

*Bragdon v. Abbott*, 524 U.S. 624,645 (1998) .........................................................24

*Brown v. Gardner*, 513 U.S. 115 (1994) ..........................................................24, 27

*In re Coastal Group, Inc.*, 13 F.3d 81 (3d Cir. 1994).............................................25

*Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989) .........................20

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999)...................................................................................5

*EEOC v. United Air Lines, Inc.*, 287 F.3d 643 (7th Cir. 2002) ........................13, 16

*Ex parte Endo*, 323 U.S. 283 (1944) ...............................................................28, 30

*Forest Grove School District v. T.A.*, 557 U.S. 230 (2009) ............................25, 27

*In re Grand Jury Proceedings*, 616 F.3d 1186 (10th Cir. 2010)............................15

*Greene v. McElroy*, 360 U.S. 474 (1959) .................................................................3

*Haig v. Agee*, 453 U.S. 280 (1981).........................................................................27

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ............................................................21

*Lorillard v. Pons*, 434 U.S. 575 (1978) ...........................................................25, 27

*Micron Technology, Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001) ...............................................................................................25, 27

---

\* Authorities upon which we chiefly rely are marked with asterisk.

*Natural Resources Defense Council, Inc. v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ............................................................................................25

*\*Pierce v. Underwood*, 487 U.S. 552 (1988) ........................................24

*RNR Enterprise, Inc. v. SEC*, 122 F.3d 93 (2d Cir. 1997).....................14

*Singleton v. Wulff*, 428 U.S. 106 (1976) ................................................6

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000)................16

*United States v. Jones*, 132 S. Ct. 945 (2012) .......................................6

*United States v. Matras*, 487 F.2d 1271 (8th Cir. 1973) .......................14

*United States v. Powell*, 379 U.S. 48 (1964) .........................................25

*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) ...................13

*United States v. Underwood*, 597 F.3d 661 (5th Cir. 2010)....................5

**STATUTES**

18 U.S.C. § 1385................................................................................11

50 U.S.C. § 1804(a) .............................................................................9

50 U.S.C. § 1805(d)(l) .......................................................................21

50 U.S.C. § 1823(a) .............................................................................9

50 U.S.C. § 1842(e)(l) .......................................................................21

*\*50 U.S.C. § 1861................................................................................2

*\*50 U.S.C. § 1861(a)(1).............................................................7, 9, 21

*\*50 U.S.C. § 1861(a)(2).......................................................................9

*\*50 U.S.C. § 1861(a)(3).......................................................................9

*\*50 U.S.C. § 1861(b)(2)(A)..................................................................7

*\*50 U.S.C. § 1861(b)(2)(B)..................................................................7

*50 U.S.C. § 1861(c)(2)(D) ...................................................................7, 19

*50 U.S.C. § 1861(d) ...............................................................................10

*50 U.S.C. § 1861(g) ...............................................................................10

*50 U.S.C. § 1861(h) ...............................................................................10

50 U.S.C. § 1881a(a) ...............................................................................21

50 U.S.C. § 3024(g) .................................................................................10

50 U.S.C. § 3036(d)(1) .............................................................................11

USA PATRIOT Improvement and Reauthorization Act of 2005, Pub.
    L. No. 109-177, 120 Stat. 192 (2006)............................................13, 19

**LEGISLATIVE MATERIALS**

H.R. 3199, 109th Cong., § 7(b)(1)(D) (July 29, 2005)............................20

S. Rep. No. 109-85 (2005) ........................................................................20

**OTHER AUTHORITIES**

Brief for Defendants-Appellees, *ACLU v. Clapper*, No. 14-42 (2d Cir.
    Apr. 10, 2014), 2014 WL 1509706 .............................................11, 16

FISC Amended Memorandum Opinion, BR 13-109 (FISC Ct. Aug.
    29, 2013) (Judge Eagan) ...................................................................26

FISC Supplemental Order of November 23, 2010 (BR 10-82)
    (released March 28, 2014) ..................................................................18

*Report on the National Security Agency's Bulk Collection Programs
    for USA PATRIOT Act Reauthorization* (Feb. 2011) ..................26, 30

Peter Wallsten, *House Panel Kept Document Explaining NSA Phone
    Program From Lawmakers*, Wash. Post., Aug. 17, 2013, at A3 ......26

## INTEREST OF AMICUS CURIAE[1]

The broad question before this Court is whether the National Security Agency ("NSA") may lawfully collect the bulk metadata on the calls, including local calls, of a massive number of Americans.  This question is of great interest to *amicus* the Center for National Security Studies ("the Center"), a project of the National Security Archive Fund, Inc., a tax-exempt organization.  The Center is dedicated to the defense of civil liberties, human rights, and constitutional limits on government power.  A principal concern of the Center is the prevention of illegal government surveillance.  Ensuring that the executive branch's domestic surveillance activities faithfully adhere to the limitations established by Congress is a critical defense of civil liberties.

Given the important issues raised by this case and their relevance to the Center's mission, the Center respectfully submits this brief of *amicus curiae* pursuant to leave granted by the Court on May 6, 2014.

---

[1] Pursuant to Fed. R. App. P. 29(c), amici curiae state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than amici curiae or their counsel made a monetary contribution to its preparation or submission.

## ARGUMENT

## I.    INTRODUCTION

The parties press this Court to resolve the far-reaching constitutional issues raised by the NSA's systematic collection of bulk telephony metadata under a program that the Solicitor General has described to the Supreme Court as the Telephony Records Program ("the program"). But this Court can rule on the program's legality on narrower statutory grounds. Under the Court's duty to avoid ruling on constitutional issues where alternative means of resolving the matter is available, *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring), the Court should hold that the NSA's program is unlawful because it is unauthorized by statute.[2]

Congress has never authorized the program. It did not do so in Section 501 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1861—the provision cited by the government as the basis of the NSA's authority to conduct the program. The program violates the plain text of Section 501 and is inconsistent with the structure of that section and

---

[2] While the Center urges this Court to grant relief restraining further bulk collection, this brief relates to only the first prong of the preliminary injunction standard—whether the movant has shown a substantial likelihood of success on the merits. The Center argues herein that that prong is satisfied because the program violates federal statute.

FISA as a whole. *See infra* Section II. Nor can Congress be deemed to have secretly ratified the program in 2011 when extending the sunset of Section 501 to June 2015. *See infra* Section III. Finding otherwise requires an unprecedented extension of the ratification-by-reenactment doctrine, and is fundamentally inconsistent with principles of democratic government. When the government acts in an area of questionable constitutionality, Congress cannot be deemed to have authorized that action by mere implication or acquiescence. *Greene v. McElroy*, 360 U.S. 474, 506-07 (1959). Rather, Congress must explicitly indicate that it intends to alter the rights and limitations normally afforded by the law. *Id.* Yet neither in the text of Section 501 nor in the extension of the sunset has Congress made such an explicit statement.

The government argued below, and the District Court held, that because FISA provides an appeal process within the FISA Court ("FISC") for recipients of Section 501 orders, the statute "impliedly" prohibits Article III courts from considering claims brought by those who are the subject of the metadata orders (such as Plaintiffs-Appellees-Cross-Appellants ("Appellees")) under the Administrative Procedure Act ("APA") that the program violates Section 501. *See Klayman v. Obama*, 957 F. Supp. 2d 1, 19-23 (D.D.C. 2013). But the government's argument and the District

Court's holding fail to properly weigh the "strong presumption that Congress intends judicial review of administrative action" in the absence of "clear and convincing evidence of a contrary intent." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 671-72 (1986) (internal quotations marks omitted). That Congress provided an exclusive means for *recipients* of orders to obtain judicial review in the FISC does not mean that Congress intended to provide no remedy whatsoever for *subjects* of records obtained under Section 501 in violation of federal law. *Id.* at 670 ("From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." (internal quotation marks and alteration omitted)).

But even if Congress intended to preclude an APA claim alleging that the program violates Section 501, there is no reason to conclude that Congress intended to prohibit Article III courts from construing the reach of Section 501 under any circumstances. As part of its consideration of the constitutional claim briefed by the parties, this Court has an obligation to first determine whether Section 501 can be construed so as to avoid a constitutional holding. *See Ashwander*, 297 U.S. at 348 (Brandeis, J., concurring) ("When the validity of an act of the Congress is drawn in

4

question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quotation marks omitted)); *see also Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality … unless such adjudication is unavoidable.")).   There is no reason to think Congress intended to interfere with exercise of that duty.  And even if it did, doing so would arguably violate separation of powers principles by requiring courts to decide an important constitutional question unnecessarily.  In short, this Court may and should consider first whether the program is statutorily authorized.[3]

---

[3] The Government has asserted in its brief that the statutory issue is not before this Court because the Appellees withdrew their statutory claims following the district court's decision to grant a preliminary injunction.  *See* Gov't Appellant's Opening Brief at 25 n.10.  Appellees indicate in their brief that they chose not to pursue the APA claim further in order to "streamlin[e]" their case.  *See* Br. for Pls.-Appellees at 17; *see also* Transcript of Hearing, at 5:5-14; 13:21-14:1.  But a party's decision not to put a claim before the Court of Appeals does not prohibit the Court from considering the issue in order to abide by its duty to resolve the case on alternative statutory grounds where available.  *See United States v. Underwood*, 597 F.3d 661, 665 (5th Cir. 2010) (considering an issue not

Resolving this matter on statutory grounds not only would allow the Court to avoid a ruling on important constitutional issues with potentially far-reaching consequences, it also would ensure that the many complex questions that the program raises are answered explicitly by Congress in the first instance, rather than by the courts attempting to draw inferences from congressional silence. As Justice Alito observed in *United States v. Jones*: "In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative. A legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way." 132 S. Ct. 945, 964 (2012) (internal citation omitted). It is for Congress in the first instance to make a legislative judgment about the appropriate balance between national security and individual privacy and security in a collection program of such size and duration.

---

raised on appeal *sua sponte* was appropriate in order to avoid ruling on a more difficult constitutional issue, per *Ashwander*); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases").

## II.     SECTION 501 DOES NOT AUTHORIZE THE PROGRAM.[4]

Section 501 permits the FBI Director to move the FISC for an order "requiring the production of any tangible things (including books, records, papers, documents, and other items) . . . ."  50 U.S.C. § 1861(a)(1).  Those tangible things must be "for an investigation to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities."  *Id.*    An application under Section 501 must include "a statement of facts showing that there are reasonable grounds to believe that the tangible things sought are *relevant to an authorized investigation*," *id.* § 1861(b)(2)(A) (emphasis added), and "an enumeration of the minimization procedures . . . that are applicable to the retention and dissemination" by the FBI of the tangible things produced, *id.* § 1861(b)(2)(B).  An order granted by the FISC under Section 501 must be limited to tangible things that "can be obtained with a subpoena duces tecum issued by a court of the United States in aid of a grand jury investigation" or other court order.  *Id.* § 1861(c)(2)(D).

---

[4] The government stated in the District Court that the NSA's bulk metadata collection has been approved under thirty-five (now thirty-seven) separate orders by fifteen separate FISC judges.  *See* Gov't Defs.' Opp. at 2-3, *Klayman v. Obama*, 957 F. Supp.2d 1, (D.D.C. 2013) (No. 13-0851), ECF No. 25 (hereinafter "Gov't Defs.' Opp.").  But none of those orders were approved with the benefit of adversarial presentation, although the FISC did allow submission of an amicus brief from the Center before approving the last order.

A walk through these provisions—with attention paid both to what is present and what is absent—shows that Section 501 does not authorize the NSA's bulk collection of the telephony metadata of virtually all Americans.[5] Specifically, the program cannot be reconciled with Section 501 because that section: (a) is explicitly directed to the FBI, not the NSA; (b) only allows production of tangible things for particular authorized investigations, not an amalgam of all current and potential future investigations; (c) requires that the tangible things be "relevant" to authorized investigations; (d) is limited to tangible things that can be obtained by a grand jury subpoena or other court order; and (e) unlike other sections of FISA that were designed to accommodate ongoing or bulk collection, contains no provision to regulate continuous collection.

---

[5] The government asserts in its opening brief that the NSA's bulk collection has never been so comprehensive that it actually included the telephony metadata of *all* Americans. Gov't Appellant's Opening Br. at 10-11. That point is irrelevant. Regardless of whether the NSA chooses to or is able to collect the metadata of all Americans, the government has maintained that Section 501 authorizes it to collect as much telephony metadata as it sees fit without limitation. *See* Gov't Defs.' Opp. at 36.

### A.    Section 501 is Explicitly Directed Just to the FBI.

In contrast to other FISA provisions,[6] Section 501 is directed explicitly to a single government entity—the FBI.  *See* 50 U.S.C. § 1861(a)(1).  Depending on the sensitivity of categories of records, Congress has prescribed in Section 501 levels of authority among officials *within* the FBI for the making of applications, 50 U.S.C. § 1861(a)(1), (a)(2) and (a)(3), but in no way has provided for any authority outside of the FBI.  The orders authorized by Section 501 are expressly similar to subpoenas and other court orders, *see infra* Sections II.c.-d., and in fact impose an additional level of supervision by requiring FISC approval before issuance.  Such orders are familiar tools of the investigatory activities performed by the FBI.  Congress's decision to place authority under Section 501 in the FBI, rather than in any other government agency including the NSA, indicates that Congress never intended that section to be the foundation of the NSA's program sweeping in massive amounts of domestic call data.

Other provisions of Title V make plain that the FBI cannot be a nominal applicant on behalf of the NSA.  The FBI's responsibilities go beyond making the initial application and extend throughout Section 501.

---

[6] For instance, a "Federal officer" may apply for electronic surveillance orders under Title I or search orders under Title II.  50 U.S.C. §§ 1804(a), 1823(a).

Both the minimization and the use provisions of Section 501 apply to records "received" by the FBI.  Section 501(g) and (h), 50 USC § 1861(g) and (h).  Section 501 places the FBI Director at the center of procedures for disclosure of information about business records orders.  Section 501(d), 50 U.S.C. §1861(d).

Congress's explicit and exclusive placement of Section 501 authority in the FBI was both sensible and significant.  Section 501 orders are addressed to businesses within the United States and involve transactions of persons within the United States, so they are likely to present questions about constitutional and statutory authority relating to persons in the United States.  It is both important and unsurprising that in Section 501 Congress vested that authority exclusively in an entity that operates directly under the Attorney General, and that is experienced with domestic investigations.

Moreover, Congress's decision to direct Section 501 to the FBI reflects a long-standing policy of limiting the scope of foreign intelligence operations in the domestic sphere.  The Director of National Intelligence has the responsibility, under section 102A(g) of the National Security Act of 1947, "to ensure maximum availability of and access to intelligence information within the intelligence community consistent with national security requirements."  50 U.S.C. § 3024(g).  But that key objective in no

10

way diminishes the need for faithfulness to fundamental decisions by the Congress on important boundaries.  Thus, the CIA Director "shall have no police, subpoena, or law enforcement powers or internal security functions." 50 U.S.C. § 3036(d)(1).  Congress also proscribes the use of the military to execute the laws "except in cases and under circumstances expressly authorized by the Constitution or Acts of Congress."  18 U.S.C. § 1385. Congress's express determination in Section 501 to grant authority regarding business records solely to the FBI constitutes a similar limitation on the role of intelligence/military organizations concerning domestic activity.

### B.    Section 501 Only Allows for Collection of Tangible Things for Specific Investigations.

As when interpreting any statute, the Court must give effect to all relevant language of Section 501 and may not adopt a reading that renders certain language meaningless.  *See Bilski v. Kappos*, 130 S. Ct. 3218, 3228 (2010).  Yet the government's interpretation of Section 501 effectively nullifies Section 501's requirement that the tangible things collected be relevant to "an authorized investigation."

It is undisputed that because the telephony metadata is collected in bulk on an ongoing basis, the records are not tied to any terrorism investigation when they are collected.  *See* Br. for Defs.-Appellees at 33, *ACLU v. Clapper*, No. 14-42, 2014 WL 1509706.  But it is clear that Section

501 requires such a connection.  For example, Section 501 requires that the investigation to which the records are relevant be conducted under approved guidelines and not based solely on First Amendment-protected activities. Additionally, the authorized investigation must be made under guidelines established by the Attorney General.   A determination whether an investigation meets those requirements cannot be made for bulk collection, since the collection is not tied to any identified investigation.

### C.     Section 501 Requires that Collection be "Relevant" to Authorized Investigations.

The records collected by the program also cannot be considered "relevant" to an authorized investigation.  The program effectively reads that phrase out of the statute, given that there is no apparent principle to differentiate those records that are within the scope of collection from those that are not.  Perhaps even more problematic is the government's effort to justify the program's vast collection by dramatically redefining "relevance." Under the government's view, relevance is to be transformed from a limitation on the government's authority, based on what is justified by the facts and circumstances of the investigation, into a blank check permitting the government to collect as much personal information as its mass surveillance tools and methods permit.

As the government acknowledged below, Congress intended the requirement that the tangible things collected be "relevant" to an authorized investigation to reflect the familiar limitation on the government's ability to collect records on Americans.  *See* Gov't Defs.' Opp. at 32-33, *Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013) (No. 13-0851), ECF No. 25 (hereinafter "Gov't Defs.' Opp.").  That limitation is routinely applied to define the permissible scope of subpoenas duces tecum issued by grand juries and administrative agencies, as well as civil discovery orders.  The requirement was added to FISA's tangible things provision by the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192 (2006).  Those 2006 amendments clarified the limitations of the broadly worded tangible records provision enacted by the USA PATRIOT Act, shortly after September 11, 2001.

Although lines between what is relevant and what is not often cannot be drawn with precision, the basic notion of relevance is that some line must exist.  *See United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) (the investigatory power of a grand jury is "not unlimited" and cannot be used "to engage in arbitrary fishing expeditions."); *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002) (the term "relevant" should not be interpreted so broadly as to render the statutory language a "nullity" (quoting

13

*EEOC v. Shell Oil Co.*, 466 U.S. 54, 69 (1984))); *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 97 (2d Cir. 1997) (a subpoena "may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power" (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950))); *United States v. Matras*, 487 F.2d 1271 1274-75 (8th Cir. 1973) (refusing to enforce an IRS summons where the IRS argued that it needed to obtain an expansive amount of information to provide a "road map" for its investigation). But the NSA's bulk collection under Section 501 admits no distinction between what is relevant and what is not. The government never asserts that particular facts or circumstances, such as the activities being investigated or the targets of the investigation, indicate that certain records may be relevant. Rather, the government simply claims that because a very small number of calls made by Americans may be relevant to a terrorism investigation, it is entitled to collect and review all the call data of all Americans in perpetuity.

The government notes that terrorism investigations often are very large, and that large subject matters have justified very broad subpoenas. *See* Gov't Defs.' Opp. at 32-35. Those observations are undoubtedly true, and it is also true that subpoenas and court orders frequently require the production of large numbers of records, even where it is clear that many of

14

the records produced ultimately will not prove to be important.  *See In re Grand Jury Proceedings*, 616 F.3d 1186, 1205 (10th Cir. 2010).  But as the government acknowledged in the District Court, the case law defining the permissible scope of "relevance" was developed in response to far more limited subpoenas and orders than what is at issue here.  Gov't Defs.' Opp. at 34 ("Of course, the case law in the contexts of civil discovery, grand jury subpoenas, and administrative investigations does not involve data acquisition on the scale of the telephony metadata collection authorized by the FISC, because the information gathered in those contexts is sought in aid of focused judicial and administrative proceedings involving identifiable individuals and events.").  Those cases provide tenuous support for the unparalleled breadth of collection at issue here.

More fundamentally, the fatal flaw of the program is not that the number of records collected is large *per se* (although the incredible breadth of the records collected certainly illustrates the program's unrestrained nature).  Rather, it is that the program simply collects the records of millions of Americans in bulk continuously without providing any way to plausibly connect the vast majority of records collected to an investigation, or to differentiate between the records that may be relevant and those that are not.  By comparison, where a doctor allegedly committed fraud related to 15,000

patients' records, the grand jury would be justified in subpoenaing the records of all 15,000, notwithstanding the large number of records involved. *See In re Subpoena Duces Tecum*, 228 F.3d at 350-51. However, the grand jury would not be justified in subpoenaing the records of all doctors perpetually without limitation to see if others had committed or would commit fraud too. The government's applications here stretch the relevance standard so far that it becomes a legal "nullity." *United Air Lines*, 287 F.3d at 653.

In order to shoehorn this massive collection into the familiar concept of relevance, the government offers a novel theory: while the vast majority of the records are not relevant to any authorized investigation, they are relevant to investigative *tools* employed by NSA—specifically, to data analytical tools used to determine patterns and connections between different phone numbers, thereby revealing associations between suspects. *See* Gov't Defs.' Opp. at 36.[7]

While this rhetorical shift—from relevance as determined by the circumstances of the inquiry to relevance as determined by the government's

---

[7] The government acknowledges that the President has directed significant changes to the program, including ending bulk collection by the NSA. *See* Br. for Defs.-Appellees at 11-13, No. 14-42, *ACLU v. Clapper*, 2014 WL 1509706. The President's decision seriously undermines the government's argument that bulk collection satisfies the requirement of relevance because such collection is somehow necessary.

investigative tools—may seem subtle, its consequences are dramatic.  On the government's view, the relevance standard does not work to limit the permissible scope of data collection to what the government actually needs for a specific investigation, but rather functions as an elastic statutory term whose meaning expands as information technology provides ever more powerful tools for executive agencies to identify matters of interest within masses of information regarding ordinary conduct, such as telephony metadata.  The government's argument does not justify smaller or greater amounts of collection depending on the actual scope of an investigation; for all terrorism investigations, regardless of size, scope or complexity, the nation's telephony metadata is apparently always "relevant."   On the government's view, it is sufficient that the data is stored in bulk and can be analyzed effectively by the NSA.  In this way, a limitation that was added in 2006 to clarify the *limits* of the 2001 amendments actually serves as an invitation for unfettered collection of records on all Americans' activities.

The potential consequences of this argument beyond the telephony metadata program are substantial.  That argument can readily be applied to justify the collection of virtually any kind of data that can be classified as a "business record," such as location information, and credit card and other financial transactions within the United States, in connection with any

17

current or potential future investigation. And, if the government is correct that the term "relevance" in Section 501 carries the same meaning as it does for grand jury and administrative subpoenas, the permissible scope of any of the many hundred authorities in the United States Code for judicial or administrative subpoenas can expand far beyond the size and scope of any specific investigation so long as advanced analytical tools can be used to search bulk data for relevant information. *See, e.g.*, FISC Supplemental Order of November 23, 2010 (BR 10-82) (released March 28, 2014) (noting that the term "relevance" governs production of financial records under the Right to Financial Privacy Act, 12 U.S.C. 3401, *et seq.*).

Perhaps recognizing the absence of a limiting principle, the government suggests that telephony metadata may be uniquely conducive to the NSA's analytic techniques, and therefore that other forms of data collected in bulk may not be considered "relevant" to those techniques. Gov't Defs.' Opp. at 36. But that bald assertion fails to account for the extraordinary power and growth of data analytics in both the public and private sectors. Public and private entities are continuously finding novel ways to learn more comprehensive and detailed information about individuals' activities, preferences, habits, associations, etc. Even assuming that the government does not currently have a productive way to analyze

other types of data in bulk, such as geolocation data or financial transactions, it is far from impossible that the government will develop such a mechanism in the future.

### D.    Section 501 is Limited to Tangible Things that Can Be Obtained by a Grand Jury Subpoena or Other Court Order.

Along with the relevance requirement, the 2006 amendments added several other restrictions under the heading "Additional Protections," Pub. L. No. 109-177, § 106(d), 120 Stat. at 197.    One provision limits the permissible scope of a production order by the FISC "only" to tangible things that could be obtained by a subpoena from a federal court, including a subpoena duces tecum issued by a grand jury.    50 U.S.C. § 1861(c)(2)(D). The government cites this provision as evidence that Congress intended Section 501 to authorize very broad collection.    As discussed above, the program far exceeds the scope of collection authorized by grand jury subpoenas and court orders.    But the government's interpretation also ignores both the text of the provision and legislative history surrounding its addition in 2006.  The provision's statement that the government may collect "only" the records that could be obtained by those other means, and its addition by the 2006 amendments under the title "Additional Protections," indicates that it was intended to act as a shield against excessive collection, not, as the government would have it, a sword authorizing virtually limitless

19

collection.  Moreover, the government fails to appreciate why that provision was added—not to broaden the scope of collection, but to ensure that privileges and other protections that limited the permissible scope of collection in other contexts also applied to Section 501.  A version of that limitation was discussed in a report of the Senate Intelligence Committee, S. Rep. No. 109-85, at 21 (2005), and prohibited collection of "privileged" records.  Another version was included in the bill reported to the Senate Judiciary Committee and passed by the Senate that prohibited collection of "protected" records.  *See* H.R. 3199, 109th Cong., § 7(b)(1)(D) (July 29, 2005).  This history indicates that the provision was added to ensure that the tangible records contemplated by Section 501, including library records, book-seller records, health records, gun sale records, etc. could not be collected in violation of established rights and privileges.

### E.     Unlike other FISA sections, Section 501 Contains No Provision to Regulate Continuous Collections.

The limitations that Section 501 omits, in addition to the ones it expressly includes, also illustrate that Section 501 does not authorize massive, perpetual collection of bulk data, but instead was intended for much narrower, discrete record collections.  This is apparent when Section 501 is compared to other FISA provisions that authorize ongoing collection.  *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[T]he

words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Those other provisions include explicit limits on the duration of the ongoing collection. Title I on electronic surveillance, Title IV on pen registers for Internet or e-mail metadata, and Title VII on overseas collection from within the United States, all authorize collection for periods of time ranging from 90 days to one year. *See* Section 105(d)(l), 50 U.S.C. § 1805(d)(l); Section 402(e)(1), 50 U.S.C. § 1842(e)(l); Section 702(a), 50 U.S.C. § 1881a(a). Yet Congress included no such provision in Section 501, indicating that Congress's intent for Section 501 was different from that of the other provisions. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute"). Unlike Sections 105, 402 and 702, which are aimed at the collection of communications and data that is created on a continual basis, Section 501 contemplates collection of "tangible things (including books, records, papers, documents, and other items)," which exist and are available at a specific period of time. *See* 50 U.S.C. § 1861(a)(1). Indeed, it is difficult to say plausibly that not-yet-created records of not-yet-placed calls are truly "tangible things."

Despite noting that Congress intended "relevance" in Section 501 to carry its ordinary meaning as developed in the context of grand jury subpoenas, civil discovery and the like, *see* Gov't Defs.' Opp. at 33-34, the government failed to cite a single case below (and the Center is aware of none) permitting continuous collections in those contexts.[8]  Instead, the government relied on the *absence* of any cases explicitly forbidding continuous collections with regard to grand jury subpoenas, discovery orders, etc. as evidence that Congress did not intend to prohibit that practice. *See id.* at 42-43.  But it is a highly dubious proposition that Congress simply intended to permit all interpretations of "relevance" not explicitly rejected by courts.  More likely, Congress intended "relevance" to apply only so far as courts had actually applied the term, and thus did not envision Section 501 being invoked to support continuous collections.

In the absence of any statutory limitation on the duration of the FISC's orders under Section 501, the FISC has required the government to reapply for an order every 90 days and has crafted other limitations to make the scope of collections more palatable, such as the Reasonable Articulable

[8] The government cites cases construing the Stored Communications Act in support of its argument.  *See* Gov't Defs.' Opp. at 43.  Even assuming those cases are useful here, they are not as instructive as cases concerning grand jury subpoenas, civil discovery, etc.  It is undisputed that Congress specifically intended to adopt the meaning of "relevance" as developed in the context of the latter types of cases.

Suspicion Standard or the number of hops permitted for searches.  But while these limiting efforts are laudable, the fact remains that they are judicial creations.  Section 501 simply was not designed by Congress to authorize continuous bulk collection.

## III.  CONGRESS DID NOT RATIFY THE FISC'S PREVIOUS INTERPRETATION OF SECTION 501 WHEN IT EXTENDED THE SUNSET OF SECTION 501 IN 2011.

The government has invoked the doctrine of "ratification through reenactment" to argue that Congress adopted the executive branch's and the FISC's expansive interpretation of Section 501 when it extended the sunset in 2010 and 2011.[9]  *See* Gov't Defs.' Opp. at 37-38.  The government's theory is that when Congress extended the sunset of Section 501 to June 2015, all members of Congress either were aware, or had an opportunity to be, that the FISC had issued orders permitting the executive branch to use Section 501 as the basis of the program.  But application of the doctrine to the circumstances surrounding the 2011 sunset extension is both unprecedented and inappropriate.  The Court should reject reliance on the ratification-through-reenactment doctrine here for two reasons: (a) applying

---

[9] The government referred to both the 2010 and 2011 extensions of the sunset before the District Court, *see* Gov't Defs.' Opp. at 37-38.  However, the government asserted that Congress had essentially the same information available to it in 2011 that it had in 2010.  Thus, the Center refers only to the 2011 renewal here.

the doctrine here conflicts with precedent and is both factually and legally

unfounded; and (b) deeming that Congress has ratified a secret interpretation

of a law which has consequences for the privacy and First Amendment

interests of all Americans and the obligations of private companies would

make the Court a party to a constitutionally suspect violation of democratic

principles.

**A.      Applying the Doctrine Here Conflicts with Precedent and Is Both Factually and Legally Unfounded.**

At the outset, because the program is not authorized by Section 501,

the ratification-through-reenactment doctrine is inapplicable.  The doctrine is

not a stand-alone rule for determining the meaning of a statute, but rather

one of numerous available canons for interpreting the meaning of a statute

beyond its text.  Like all such canons, this doctrine cannot override the clear

meaning of the law.  *See Brown v. Gardner*, 513 U.S. 115, 121 (1994).  As

shown above, plain language and statutory structure do not support the

government's interpretation of Section 501; the ratification doctrine alone

cannot trump Congress's originally intended meaning.

The ratification doctrine should not be applied for additional reasons.

First, contrary to the government's argument, the opinions of the FISC do

not constitute a "settled judicial interpretation."  *See Pierce v. Underwood*,

487 U.S. 552, 567 (1988); *see also Bragdon v. Abbott*, 524 U.S. 624, 645

24

(1998). The FISC's interpretation of Section 501 has never been subject to appellate review by the FISA Court of Review, let alone by a court of appeals or the Supreme Court. *See United States v. Powell*, 379 U.S. 48, 55 n.13 (1964) (declining to hold that Congress adopted the interpretation of four lower courts, as those opinions did not constitute settled law); *see also Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1311 (Fed. Cir. 2001); *In re Coastal Grp., Inc*., 13 F.3d 81, 85 (3d Cir. 1994).

The secretive nature of the FISC proceedings makes application of the ratification doctrine even more problematic. The doctrine is based on the legal assumption that Congress is aware of well-settled interpretations when it reenacts a statute—an assumption that must be employed cautiously given that it effectively places the court in the position of the legislature. *See Natural Resources Defense Council, Inc. v. EPA*, 824 F.2d 1146, 1162 n.10 (D.C. Cir. 1987). Such an assumption may be justified where the source of the interpretation is the Supreme Court or uniform holdings by numerous courts of appeal. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But no such an assumption is warranted here, where no formal opinion by any court upholding the government's interpretation of Section 501 had even been authored until Judge Eagan's opinion in the FISC in 2013, written two years

25

after the 2011 sunset extension, and the very opinion that then applied the ratification doctrine. *See* FISC Am. Mem. Op., No. BR 13-109 (FISA Ct. Aug. 29, 2013), Appellants' App'x at 129-57.

Judge Eagan's FISC opinion illustrates the dangers of applying the doctrine here. The opinion states that Congress was made aware of the FISC's approval of the program by way of a five-page secret "Report on the National Security Agency's Bulk Collection Programs for USA PATRIOT Act Reauthorization" (hereinafter "the February 2011 Report"). *Id.*, Am. Mem. Op. at 24-26, Appellants' App'x at 152-54. But as stated above, in 2011 no FISC opinion (or an opinion by any court) had yet been authored that provided a reasoned justification for its interpretation of Section 501. The Report contains only a cursory description of the FISC's orders authorizing the program and provides no legal reasoning. *See* February 2011 Report, Appellants' App'x at 268-72. Moreover, it is uncertain whether the Report was even available to all members of Congress. *See* Peter Wallsten, *House Panel Kept Document Explaining NSA Phone Program From Lawmakers*, Wash. Post., Aug. 17, 2013, at A3. While the government has stated that the Senate Intelligence Committee made the report available to all Senators ahead of the 2011 reauthorization, it has made no similar representation concerning the House of Representatives.

26

*See* Gov't Defs.' Opp. at 37 n.23.   The problem with applying the ratification doctrine here is apparent: the doctrine is intended to be applied where the fact that Congress was on notice of a judicial interpretation is unassailable, not where the Court must wade through contested facts.

The government has also relied on the proposition that where Congress ratifies statutory language that has been subject to a longstanding *administrative* construction, it is presumed to have adopted that construction. *See* Gov't Defs.' Opp. at 38.  It cites *Haig v. Agee*, 453 U.S. 280 (1981), as support.   But that decision concerned a longstanding administrative interpretation that had been publicly available for congressional scrutiny for 70 years, *id.* at 296-98, not a secret program in operation for only several years.   Moreover, courts have held that application of the ratification-by-reenactment doctrine typically requires a clear indication that Congress was aware of the existing interpretation and intended to adopt it.  *See Brown*, 513 U.S. at 121; *see also Lorillard*, 434 U.S. at 582-83 (noting that the legislative history expressly stated approval of the existing interpretation); *Forest Grove*, 557 U.S. at 239-40 (finding that the existing interpretation furthered Congress's purpose in reenacting that provision); *Micron*, 243 F.3d at 1311 (holding that there was no indication that Congress was aware of the decision by the Court of International Trade).   Relying on a clear statement

27

of congressional intent is critical to ensure that the Court does not reverse the constitutional roles of Congress, the executive and the judiciary by substituting the statutory interpretations of other branches for congressional enactments.  Here, the executive branch's report and this court's orders do not reflect a well-settled, longstanding interpretation, and Congress has provided no clear statement that it intended to adopt that interpretation.

In *Ex Parte Endo*, 323 U.S. 283 (1944), an opinion that precipitated the end of the internment of Japanese-Americans during World War II, the Supreme Court rejected the government's efforts to employ the ratification doctrine in an analogous situation.  The issue was whether a lump-sum appropriation for the War Relocation Authority constituted ratification of the detention program that it administered.  The government argued that the Authority's regulations and procedures for the detention program had been disclosed in reports to Congress and in congressional hearings.  The Court rejected this argument saying that "the appropriation must plainly show a purpose to bestow the precise authority which is claimed.  We can hardly deduce such a purpose here where a lump sum appropriation was made for the overall program of the Authority and no sums were earmarked for the single phase of the total program which is here involved."  *Id.* at 303 n.24.

28

Much as in *Endo*, the actual circumstances of the sunset extension here are fraught with ambiguities that undermine any effort to draw an unambiguous conclusion that Congress affirmatively decided that Section 501 authorized the program.

First, a sunset extension should fairly be seen as a postponement of a decision rather than an endorsement of any particular application of the extended statute. Prior to the FISC's opinions in 2013, no court had ever applied the ratification doctrine to a sunset extension.

Second, a member voting on the 2011 sunset extension of Section 501 confronted a landscape of choices and consequences that should make any court hesitant to render judgment about what the Congress intended. To begin with, the 2011 sunset applied to three separate authorities: business record collection, roving wiretap authority, and lone wolf collection. Members were presented with an up-or-down vote on the package. A member concerned about bulk business record collection may have been constrained to vote favorably in order to continue the effectiveness of roving wiretap and lone wolf authority.

In the words of *Endo*, the 2011 sunset extension did not evidence "a purpose to bestow the precise authority which is claimed" by the

29

government.  323 U.S. at 303 n.24.  And Congress may have supported other

uses of Section 501 "without ratifying every phase of the program."  *Id.*

### B.    Secret Ratification is Inconsistent with Democratic Principles.

Congress occasionally considers certain matters in closed session.

Examples include closed sessions of the Senate during impeachment trials or

when it is assessing the verifiability of a provision of a proposed arms-

control treaty.  Congress may also spell out in a classified annex spending

details for military or intelligence authorizations or appropriations.  But

Congress has never in its 225 years enacted a secret law, or secret terms for

an otherwise public law, that regulates and acts directly on private entities

and persons.  If Congress had secretly passed a statute expressly authorizing

bulk metadata collection, that legislation would be constitutionally

problematic.  Secret legislation is inconsistent with the democratic principles

and values that have long animated our constitutional system.

When the executive branch provided in 2011 a limited report on the

fact of bulk telephony collection, it included a capitalized admonition:  "IT

IS IMPERATIVE THAT ALL WHO HAVE ACCESS TO THIS

DOCUMENT ABIDE BY THEIR OBLIGATION NOT TO DISCLOSE

THIS INFORMATION TO ANY PERSON UNAUTHORIZED TO

RECEIVE IT."  February 2011 Report at 1, Appellants' App'x at 268.  In

the view of the executive branch, the American people were among those who were unauthorized to receive it.  This meant that the legislative process did not operate in normal fashion.  Members of Congress could not consider the views of the American public in deciding how to vote.  Nor could they publicly discuss or explain their votes.  As a result, members of Congress inclined to vote against extending Section 501, because they believed it had been misused, would have known they could not fully explain a "no" vote to their constituents.  The great accountability mechanisms of our constitutional system—voting, speech, and petitioning Congress—are rendered inoperable when citizens do not know what their representatives have voted for or against and what the President has signed into law.

The courts of this country should not become agents tilting the balance against democratic governance.  The ratification doctrine is a judicial canon that should never be employed by the Court to achieve indirectly what the Congress has never sought to do directly, namely, enact a secret law that empowers the Court to compel private parties to provide records concerning the private communications of Americans to the government.

**CONCLUSION**

For the foregoing reasons, the Court should rule that the bulk

metadata collection program is not statutorily authorized.

Dated: August 20, 2014         Respectfully submitted,


                               /s/  Paul M. Smith
Michael Davidson, D.C. Bar No.  Paul M. Smith, D.C. Bar No. 358870
449007                         Michael T. Borgia, D.C. Bar No.
3753 McKinley Street, NW        1017737
Washington, DC  20015          Jenner & Block, LLP
(202) 362-4885                 1099 New York Avenue, N.W.,
mdavid2368@aol.com             Suite 900
                               Washington, DC  20001
*Of Counsel*                   (202) 639-6000 (telephone)
                               (202) 639-6066 (fax)
                               psmith@jenner.com

                               Kate A. Martin, D.C. Bar No. 949115
                               Center for National Security Studies
                               1730 Pennsylvania Ave., N.W., S.
                               700
                               Washington, D.C. 20006
                               (202) 721-5650 (telephone)
                               (202) 530- 0128 (fax)
                               kmartin@cnss.org

                               Joseph Onek, D.C. Bar No. 43611
                               The Raben Group
                               1640 Rhode Island Ave., N.W., S.
                               600
                               Washington, D.C. 20036
                               (202) 587-4942 (telephone)
                               (202) 463-4803 (fax)
                               jonek@rabengroup.com

                               *Counsel for Movant Center for
                               National Security Studies*

33

## CERTIFICATE OF COMPLIANCE

I, Michael T, Borgia, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitation of Fed R. App. P. 29(d).  The brief contains 6,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.


August 20, 2014                                    /s/ Michael T. Borgia

34

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 20th day of August, 2014, in accordance with Circuit Rule 25(c), I caused the foregoing brief to be filed with this Court's ECF system.

/s/ Michael T. Borgia